IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PHILIP HOGAN,

    Plaintiff,

  v.

DR. SALEM SYED, et al.,

    Defendants.

OPINION and ORDER

Case No.  18-cv-350-wmc

---

*Pro se* plaintiff Philip Hogan is currently incarcerated by the Wisconsin Department of Corrections ("DOC") at Kettle Moraine Correctional Institution.  In 2014, when Hogan was incarcerated at Columbia Correctional Institution ("Columbia"), he injured his knee. Under 42 U.S.C. § 1983, the court granted Hogan leave to proceed in this lawsuit against six health care professionals working at Columbia between August 17, 2015, and May 8, 2017, on Eighth Amendment deliberate indifference and negligence claims for failing to diagnose and treat his knee injury properly, resulting in a delay of surgery needed to repair what was eventually diagnosed to be a torn meniscus.  Currently before the court is defendants' motion for summary judgment.  (Dkt. #24.)  Since the evidence of record does not support a reasonable inference of deliberate indifference as to any of the defendants, the court will grant defendants' motion and relinquish supplemental jurisdiction over Hogan's state law claims.

UNDISPUTED FACTS[1]

**A.  Hogan's Treatment for his Knee Injury August of 2015**

In October 2014, Hogan reported to the Health Services Unit ("HSU") with knee pain and swelling.  At that time, Hogan explained that the pain started after he did leg extensions with 500-pound weights and felt something pop.  In response, nursing staff gave him ibuprofen and ordered him to rest his knee.

In December 2014, a non-defendant, Dr. Karl Hoffman, referred Hogan to another non-defendant, Dr. Ellen O'Brien, who is employed by the Wisconsin Department of Corrections ("DOC") as a physician/orthopedist.  Hoffman noted in relevant part that he suspected a "torn medial meniscus, although the medial collateral ligament is in the same area, and a bursa under the same."  (Malchow Decl., Ex. 1000 (dkt. #30-1) 61.)  In particular, Hoffman sought Dr. O'Brien's opinion about Hogan's condition, "possible treatment modalities, and if indicated possible further imaging."  (*Id.*)

Dr. O'Brien met with Hogan on January 16, 2015.  She noted that Hogan reported mild medial discomfort of the knee.  At that time, Dr. O'Brien could not exclude a medial meniscus tear but found that his discomfort could also be arthritic in nature.  (Malchow Decl., Ex. 1000 (dkt. #30-1) 57-62; O'Brien Decl. (dkt. #28) ¶ 10.)  Given his history of lifting heavy weights, Dr. O'Brien further noted that Hogan might be experiencing

---

[1]  Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

degenerative changes.  As a result, Dr. O'Brien prescribed Hogan a physical therapy ("PT") consult, evaluation and treatment to teach him a home exercise program, observing that Hogan was getting better and reported that he was improving with activity moderations.[2] Even though she noted the possible meniscus tear, Dr. O'Brien further attests that the standard of care for that type of tear would not have been to order surgery immediately.

On January 29, 2015, Hogan had his PT consult with Dr. Philipp Hoechst, a named defendant who previously worked as a physical therapist at Columbia.  Hogan reported that his workouts involved "hours and hours of exercise including 1,000+ reps of squats." (Ex. 1000 (dkt. #30-1, at 50.)   Dr. Hoechst then educated Hogan about appropriate workouts and exercises, and he ordered six weeks of PT, once per week.  Dr. Hoechst also ordered iontophoresis with dexamethasone, a steroid infused cream/gel administered via ultrasound, as well as home exercise programs.

On February 9, 2015, Hogan had his next meeting with Dr. Hoechst.  Hogan reported that:  (1) his first PT session seemed to help somewhat; and (2) he had lightened his physical activity, although not significantly.  Dr. Hoechst noted that he advised Hogan that he could respond well to conservative treatment by limiting aggressive knee loading activities.  Hogan disputes this exchange, claiming that he did not tell Dr. Hoechst that the PT helped, and that he specifically asked when he would be scheduled for an MRI. Hogan further claims that Dr. Hoechst responded that before he would receive an MRI,

---

[2]  While Hogan claims that he continued to feel pain, that is not inconsistent with Dr. O'Brien's impression that he was "getting better" or even her notation that he reported "improvement." Indeed, Hogan does not represent that he reported any specific pain to Dr. O'Brien beyond continuing "discomfort."

he would need to do six PT sessions.  Hogan also suggests that their exchange became so heated that a correctional officer asked him to leave HSU.[3]  Regardless, on February 18, 2015, there is no dispute that Hogan refused further treatment from Dr. Hoechst, stating that he would "work it out himself."  (Ex. 1000 (dkt. #30-1) 39, 50.)

### B.  Hogan's Medical Care Between August 2015 and Early 2016

In August of 2015, Hogan submitted multiple HSRs complaining about knee pain. In response, Hogan was informed that he had an upcoming appointment scheduled. Although Hogan was originally scheduled to be seen on September 3, 2015, his appointment had to be rescheduled for security reasons, so he met with defendant Trisha Anderson on September 10, 2015, who was then working as a nurse at Columbia's HSU. Hogan informed Nurse Anderson that he was staying off his knee, but he wanted to play basketball and had felt a pop and tear that hurt to walk on.  Hogan further reported that this knee had never "correctly healed" from the December 2014 injury, and that he reinjured his knee while sprinting.  (*See* Pl. Ex. B (dkt. #37-2).)  At that time, Nurse Anderson prescribed ice, ibuprofen, acetaminophen and rest.  She further advised Hogan to follow P.R.I.C.E. therapy -- protect, rest, ice, compression and elevate.

On September 23, 2015, defendant Syed, who worked as a physician at Columbia between 2014 and 2018, met with Hogan regarding his knee pain for the first time.

---

[3] The only corroborating evidence Hogan cites for his version of this exchange are Health Services Requests ("HSRs") that he submitted between 2016 and 2017, well after these early meeting with Dr. Hoechst.  (See Pl. Ex. A (dkt. #37-1).)  For example, in an inmate complaint that Hogan filed in March of 2016, he alleged that:  (1) he asked Dr. Hoechst about an MRI; and (2) Dr. Hoechst responded that an ortho specialist would have to make that decision.  (Pl. Ex. D (dkt. #37-4).)

According to Dr. Syed, Hogan reported that his knee pain had started a year ago when he was lifting heavy weights, and it worsened in the prior week when he was playing basketball.  (Syed Decl. (dkt. #26) ¶ 10.)  Dr. Syed noted no swelling or tenderness in Hogan's knee and found that he had a full range of motion.  Although Hogan does not dispute Syed's characterizations, he claims to have also shown Dr. Syed the spot of his pain, which Hogan claims was consistent with the location of his tear.  Regardless, Dr. Syed diagnosed Hogan with a left knee sprain and ordered naproxen, 500 mg, for three months for the pain and inflammation, an x-ray for his left knee, and a referral to PT for evaluation and treatment.  (Ex. 1000 (dkt. #30-1) 7, 33, 128.)  Dr. Syed now explains that the recommended course of treatment for a knee sprain is over-the-counter pain relievers (such as ibuprofen or acetaminophen), rest, ice, stabilization with a wrap or brace, and physical therapy.  (Syed Decl. (dkt. #26) ¶ 11.)

Without citing any evidence, Hogan claims that:  (1) Dr. Syed's diagnosis was "wrong"; and (2) he should have diagnosed his torn meniscus based on Dr. Hoffman's December 3, 2014, note that he suspected a meniscus tear.  According to Dr. O'Brien, however, if Dr. Syed did not see any meniscal issues, it was appropriate in her opinion, as an orthopedist, for Syed not to order an MRI at that time.  (O'Brien Decl. (dkt. #28) ¶ 16.)  Further, Dr. O'Brien notes that degenerative knee issues may be treated with activity modifications, injections, physical therapy and anti-inflammatory pain relievers. Indeed, this was obviously her opinion in January of 2015 as well, notwithstanding Dr. Hoffman's suspicion in referring Hogan for a consult.

Moreover, Hogan underwent an x-ray on September 29, 2015, which showed no fracture or significant abnormalities.  Hogan also purports to dispute that the x-ray was normal -- claiming that HSU staff told him he had "bone spurs" but again, cites no admissible evidence in support.  Also that same day, Dr. Hoechst met with Hogan for a PT consult, during which Hogan reported that he did not have knee pain when walking, but did experience pain when playing basketball or doing repetitive squats.  Remarkably, Hogan also reported that he was still doing 500-1500 step ups.  In response, Dr. Hoechst encouraged Hogan to stop all repetitive lower extremity exercise, and to stop impact.[4] Finally, Hogan asked Dr. Hoechst for new shoes and an MRI.  If Hogan did 4-6 sessions and showed no improvement, Dr. Hoechst then agreed to refer him to Dr. O'Brien.  He also prescribed Hogan dexamethasone, a corticosteroid.

Again, in Dr. O'Brien's opinion, physical therapy is an appropriate prescription to treat a knee injury, even when the injury is a suspected meniscus tear.  Dr. O'Brien explains that orthopedic specialists work closely with physical therapists, because PT is often the best starting point for orthopedic injuries.  In particular, she explains that it is important for patients to learn how to strengthen muscles and ligaments surrounding the knee and in the legs properly to improve support of the knee joint, as well as prevent further injury to the knee or other points, all of which can avoid more aggressive treatment options, such as surgery.  Dr. O'Brien further opines that patients should be able to show that he or she can comply with PT *before* surgery to ensure compliance with post-operative PT.  Moreover, Dr.

---

[4] Hogan claims that he stopped all lower body exercises, but he does not specify when he stopped those exercises.

O'Brien states that it is normal for patients to experience some pain or discomfort during physical therapy.  Finally, as to meniscus tears in particular, Dr. O'Brien attests that patients can have the same outcome with conservative management rather than surgery, and surgery is accompanied by risks.

On January 5, 2016, Dr. Syed saw Hogan again.  At that time, Hogan reported that his state-issued shoes made his knee pain worse.  Therefore, Dr. Syed ordered Hogan a knee brace and recommended that Hogan be allowed to wear his personal shoes at all times, so long as security agreed.

Dr. Hoechst also had another appointment with Hogan on February 1, 2016.  According to Dr. Hoechst, Hogan reported that he was still doing 300 squats and 100 jumping jacks daily, and that he confusingly reported that his pain was "not constant, but it's there all the time." (Ex. 1000 (dkt. #30-1) 39-40.)  In contrast, Hogan claims that he had stopped doing lower body exercises entirely by that point, and that he had been reporting "extreme pain" in HSRs during this same time frame, citing the HSRs that he submitted between *October* 2016 and February 2017.  (*See* Pl. Ex. A (dkt. #37-1).)  In February 2016, Dr. Hoechst also contemporaneously noted Hogan's renewed request for an MRI, asking that Hoechst "just tell me how many more times I need to see you before I can get an MRI."  Dr. Hoechst also noted that Hogan showed little interest in rehab or therapy.  (Ex. 1000 (dkt. #30-1) 39-40.)  Despite Hogan's failure to participate in PT, Dr. Hoechst nevertheless recommended Hogan be referred to Dr. O'Brien that same day, ordered a knee sleeve, and prescribed iontophoresis and dexamethasone treatment for his

left knee.  Also, on February 1, 2016, Dr. Syed ordered the referral back to Dr. O'Brien based on Dr. Hoechst's recommendation.

### C.  Hogan's Interactions with HSU Staff in Early 2016

Between January and April of 2016, Hogan submitted *17* HSRs reporting continuing left knee pain.  The HSRs varied somewhat, but the main complaints Hogan raised were that:  it had now been two years since he injured his knee; physical therapy was not working; he needed an MRI; "masking the pain" was not working; the pain was affecting daily activities and causing him trouble sleeping; and his hip was starting to hurt. (*See* Ex. 1000 (dkt. 30) 77-95, 97-98.)

Columbia nursing staff responded to each of these HSRs by either indicating that: (1) Hogan had an upcoming appointment with a doctor, physical therapist, or offsite orthopedist; or (2) he was scheduled for a sick call appointment with nursing staff. Additionally, nursing staff examined Hogan for his knee pain on January 25, March 7, March 4, and April 4, 2016.  During those visits, nursing staff provided Hogan with various interventions to address his pain, including ibuprofen, ice, and a knee brace.  (*Id.* at 133, 139-43.)   Additionally, Hogan was referred to both an onsite and offsite orthopedic specialist, and he received injections in his knee.

Defendant Candace Warner, a registered nurse who served as Columbia's Health Services Manager ("HSM"), explains that an HSM's duties do not normally involve providing direct care to patients, and HSM's do not have the authority to prescribe medication, other than ordering over-the-counter drugs, referring patients to offsite

specialists, ordering imagine studies, or overriding the treatment decision of the advanced care provider ("ACP") in the HSU.[5]  ACP's included physicians, nurse practitioners and physician assistants.  More specifically, HSM's do not have the authority to order an MRI.  Additionally, it is undisputed that the other nurse defendants, Jamie Gohde, Melissa Thorne and Trisha Anderson, had no role in deciding whether to order an MRI for Hogan.

In response to his repeated HSRs, Dr. Syed also met with Hogan two times during this same time frame, while Hogan was waiting for his consult with Orthopedist Dr. O'Brien.  On March 9, Hogan expressed to Dr. Syed his repeated desire to have an MRI on his knee.  However, Dr. Syed did not believe Hogan needed an MRI, having already referred him to Dr. O'Brien for further evaluation on Dr. Hoechst's recommendation.  Plus, Hogan had an appointment with her scheduled for March 16, 2016.  Additionally, Dr. Syed noted that:  Hogan did not have any swelling in his knee; he was walking fine; and his range of motion was fine.  Although Dr. Syed did not believe there was an urgent need to schedule an MRI, he did offer Hogan a cortisone injection for his knee pain.

Unfortunately, Hogan did not end up meeting with Dr. O'Brien on March 16, because his unit was on a flu quarantine at that time.  Instead, on March 30, 2016, Dr. Syed saw Hogan for his cortisone injection.  At that time, Hogan again requested an MRI, and Dr. Syed attests that he tried to explain his reason for not ordering an MRI, but Hogan would not listen, causing Dr. Syed to leave the room to avoid escalation.  (Syed Decl. (dkt. #26).)  Hogan has a different version of that conversation, claiming he told Dr. Syed that

---

[5] Warner acted as HSM a limited basis between April 14, 2016, and July 28, 2016, and then served as a mentor to Columbia's new HSM, Jamie Gohde, a trained nurse, between March 2017 and May 15, 2017.

he was in extreme pain, and that he *specifically* asked him whether the injection would heal the injury or mask the pain, but Dr. Syed responded by having a correctional officer escort him out of HSU.[6]   Following that appointment, Dr. Syed discontinued the cortisone injections, which Hogan plainly was not interested in pursuing, and instead focused on getting him an MRI, which Hogan does not dispute.  Dr. Syed also placed Hogan on an activity monitor for one week to make sure he was not reinjuring his knee by lifting weights or playing basketball.

### D.  Dr. O'Brien's May 19, 2016, MRI Recommendation and Hogan's Eventual Surgery

During the week of May 8, 2016, the staff monitoring Hogan's activity reported to HSU that Hogan:  was up wandering around and able to obtain his own trays; signed up and attended recreation; was able to ambulate without difficulty, had a normal gait and attended activities; and was not complaining about his injuries.  (Ex. 1000 (dkt. #30-1) 143.)

On May 19, 2016, Dr. O'Brien saw Hogan, and this time she also recommended an MRI of his left knee.  Dr. Syed then wrote an order for an off-site referral to UW Radiology for an MRI.  Although the DOC's Medical Director denied Dr. Syed's request for an MRI on August 19, 2016, a different physician, Dr. Springs, submitted a new MRI request in September 2016, and that request was eventually approved by the Medical Director.

---

[6]  Hogan has not submitted a declaration or affidavit, nor has he signed his response to defendants' proposed findings of fact under penalty of perjury, but the court has generally credited his version of exchanges with HSU staff for purposes of summary judgment.

Hogan underwent an MRI on October 31, 2016.  Based on that imaging, Hogan was diagnosed with degenerative joint disease *and* a degenerative, horizontal medial meniscus tear.  Dr. O'Brien explains that horizontal tears are almost always degenerative. (O'Brien Decl. (dkt. #28) ¶ 20.)   Hogan also had extensive synovitis (irritation or inflammation of the knee joint) and chondrosis (cartilage deterioration).  Dr. O'Brien explains that these conditions are caused by overloading the meniscus with prolonged weight-bearing activities, such as squatting or performing high-impact exercises with improper form.

On December 28, 2016, another non-defendant, Dr. Grossman, met with Hogan and informed him that he would need to accept the situation or consider elective, left knee arthroscopy.  Dr. Grossman also emphasized that his knee might not get better if the cause of his discomfort was from degenerative joint disease, since arthroscopy would then be ineffective.  Hogan decided to proceed with the surgery, and he underwent a left knee arthroscopy on May 8, 2017.

Following surgery, Hogan's complaints about left knee pain and swelling continued, but he claims that his pain was associated with the healing process and that he is pain-free now.  However, Dr. O'Brien opines that Hogan's post-surgical complaints related to the degenerative changes in his patellofemoral joint, not his meniscus injury, and in any event, that his post-surgery complaints are not related to the delay between his December 2014 injury and his May 2017 surgery.  Moreover, in Dr. O'Brien's opinion, even if the MRI had been ordered earlier, a conservative approach would still have been advised for a few reasons.  For one, conservative care should be the first step because a knee scope can make

the patient worse if the knee problems are arthritic.   Additionally, all surgeries are accompanied by risks, and a meniscus tear can have the same outcome with conservative management as with surgery.

For these reasons, Dr. O'Brien maintains that starting with the conservative approach was the safest course of action to address a suspected degenerative knee injury like Hogan's.   Dr. O'Brien further opines that the medical staff did not fail to properly diagnose Hogan's knee injury, and she believes the pain and decreased mobility that Hogan experienced were caused by the degenerative nature of his injury and failure to abide by his medical providers' recommendations and treatment plans.   Finally, Dr. O'Brien maintains that Hogan's continued activity level suggests his reported pain levels were out of proportion to his actual medical needs.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.   *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party, although not inferences supported merely by speculation or conjecture.   *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman*

*v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).   Defendants seek summary

judgment in their favor on Hogan's Eighth Amendment and state law claims.[7]

## I.     Eighth Amendment

The Eighth Amendment gives prisoners the right to receive adequate medical care.

*Estelle v. Gamble*, 429 U.S. 97 (1976).   To prevail on a claim of constitutionally inadequate

medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical

condition and (2) a state official who was deliberately (that is, subjectively) indifferent.

*Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750

(7th Cir. 2011).   For purposes of summary judgment, defendants do not dispute that

Hogan's knee condition constituted a serious medical need; instead, they seek judgment

on the ground that no reasonable trier of fact could find defendants' handling of his knee

injury constituted deliberate indifference.

"Deliberate indifference" means that the official was aware the prisoner faced a

substantial risk of serious harm but disregarded that risk consciously by failing to take

reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).   To

meet a deliberate indifference threshold, a plaintiff must prove *more than* negligent, or even

grossly negligent acts, although something less than *purposeful* acts.   *Farmer v. Brennan*, 511

U.S. 825, 836 (1994).   This threshold is met by evidence that:  (1) "the official knows of

and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both

---

[7]  With respect to Hogan's Eighth Amendment claims, defendants also raise qualified immunity as
a ground for relief.   The court need not reach that issue since the record does not support finding a
constitutional violation as a matter of law.

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet consciously chooses not to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

Here, Hogan principally argues that Dr. Syed's failure to obtain an MRI of his knee sooner amounted to a conscious choice not to take a reasonable step to avoid his ongoing pain, and that the other defendants were complicit in disregarding his ongoing pain.  A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."  *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).  Moreover, a jury may infer deliberate indifference when (1) other medical providers persist in a course of treatment known to be ineffective or (2) the treatment involved an inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31. However, since the undisputed evidence establishes that defendants provided Hogan with consistent care for his knee injury, and the decision not to order an MRI until roughly a year and a half after inquiry was largely grounded in the medical judgment of a non-

14

defendant specializing in orthopedics, Dr. O'Brien, no reasonable jury could find any of the defendants handled Hogan's knee injury with deliberate indifference.

### A.    Dr. Syed

Hogan faults Dr. Syed for failing to order an MRI until May of 2016, thus delaying his May 2017 surgery.  As an initial matter, the fact that Hogan eventually did obtain an MRI, and then surgery on his knee, is not enough, by itself, for a reasonable trier of fact to find that Dr. Syed's decision to wait until May of 2016, to recommend the MRI amounted to deliberate indifference.  Indeed, "[a]n MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'"  *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)); *Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017).  Regardless, the evidence at summary judgment does *not* support a finding that Dr. Syed lacked a medical basis to delay recommending an MRI, and unnecessary prolonged his pain and suffering.  *See Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, . . . delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering").  To the contrary, the record suggests only that Dr. Syed did not see an urgent need for an MRI between when he first met with Hogan in September 2015, almost a year after his initial knee injury, and March 2016, when he offered him a cortisone injunction and began to support Hogan getting an MRI of his knee.

Specifically, Dr. Syed started seeing Hogan for his knee pain on September 23, 2015, and agreed with Dr. O'Brien's recommendation for an MRI in May of 2016, so the question is whether Dr. Syed's decision not to order an MRI himself or refer Hogan back to Dr. O'Brien sooner than February of 2016 supports a reasonable inference of deliberate indifference. On this record, a reasonable fact-finder would have to conclude the answer to that question is "no."

Hogan first challenges Dr. Syed's handling of his injury on September 23, 2015, when Dr. Syed diagnosed him with a sprained knee. Hogan specifically claims that Dr. Syed exhibited deliberate indifference in failing to consider Dr. Hoffman's December 2014 suspicion that Hogan had a torn meniscus. In fairness, Dr. Syed neither attests that he reviewed Dr. Hoffman's assessment, nor reviewed Dr. O'Brien's January 16, 2015, assessment that his knee pain could be arthritic or a meniscal tear, as well as her recommendation for PT and a moderation of other physical activity. However, even assuming Dr. Syed reviewed Hogan's previous records, he was certainly not bound to conclude that Hogan had a meniscus tear and required an MRI at that time.

To start, Dr. Hoffman's opinion was *not* nearly as definitive as Hogan would now suggest; Hoffman merely noted that he "suspected" a tear, but wanted Dr. O'Brien's opinion about Hogan's knee as an orthopedic specialist, *and* wanted *her* to consider whether imagining would be appropriate. More importantly, Dr. O'Brien was less convinced that Hogan was suffering from a meniscus tear. While she did not rule out that possibility, Dr. O'Brien suspected that Hogan's history of lifting heavy weights were causing degenerative changes, which in turn were causing his discomfort. Furthermore, at that time, Dr. O'Brien

16

observed that Hogan's knee appeared to have been improving with moderated activity. Accordingly, *at worst*, Hogan's medical records by the fall of 2015 continued to leave room for reasonable, medical disagreement as to (1) whether Hogan might be suffering from a torn meniscus, *and* (2) whether imaging was necessary.

Moreover, even though Hogan claims that his knee pain persisted between O'Brien's January 2015 assessment and his September 2015 visit with Dr. Syed, Hogan was actually seeing Dr. Syed in September for a *new* issue, having reported to Nurse Anderson that he had heard a "pop" while he was playing basketball and claiming that he reinjured his knee, which had never fully healed.  Dr. Syed's account of his first interaction with Hogan is similar, reporting that his knee pain started a year before when he was lifting heavy weights and "had gotten worse in the last week while playing basketball."  (Syed Decl. (dkt. #26) ¶ 10.)  Based on Hogan's reported symptoms, therefore, it was certainly reasonable for Dr. Syed to assess Hogan as experiencing exacerbation of his chronic knee degeneration as Dr. O'Brien, a specialist, had suspected in January of 2015, than to believe he was suffering from a long, undiagnosed meniscus tear as Dr. Hoffman apparently suspected in December of 2015.

Hogan's challenge to Dr. Syed's knee sprain diagnosis, despite Hogan reportedly pointing out the exact spot of his tear, is even less persuasive.  Hogan has not submitted evidence suggesting that Dr. Syed's was even wrong, particularly given his observations that Hogan's knee was not swelled and had a full range of motion.  Regardless, while Hogan obviously disagrees with Dr. Syed's belief that Hogan strained his knee, he has certainly offered no evidence suggesting that Dr. Syed wholly disregarded any symptoms signaling

that the cause of his pain was a torn meniscus or required an emergency MRI almost a year after the claimed tear. Even assuming Dr. Syed's diagnosis was incorrect, that mistake does not suggest deliberate indifference. *See Zackery v. Mesrobian*, 299 F. App'x 598, 600-02 (7th Cir. 2008) (misdiagnosing a torn meniscus as osteoarthritis did not establish deliberate indifference by itself, since plaintiff "submitted no evidence that would allow a reasonable fact-finder to conclude that [the defendant's] decisions were based on anything other than medical judgment," *even though* it "may have been prudent" to order further testing).

Further, Dr. Syed did *not* leave Hogan untreated in September 2015. He ordered naproxen for three months, an x-ray and a PT referral. Even assuming Dr. Syed was negligent in not suspecting a torn meniscus, this treatment still fell within acceptable professional standards. Indeed, Dr. O'Brien herself opines that a suspected meniscal tear does not require an immediate MRI, and even when a meniscus tear is suspected, physical therapy is a proper first course of treatment. Tellingly, this *was* her own conservative approach in January of 2015. Plus, Hogan has not only failed to offer any evidence to the contrary, it is undisputed that for the following months after Dr. Syed's proposed treatment, Hogan in fact attended PT appointments with Dr. Hoechst.

Dr. Syed next met with Hogan on January 5, 2016, who complained that his state-issued shoes made his knee pain worse. Dr. Syed addressed that concern head-on, issuing Hogan a knee brace and recommending that he be allowed to wear his personal shoes. This interaction, too, constitutes *no* proof that Dr. Syed was knowingly ignoring Hogan's

medical need for an MRI; rather, it indicates Dr. Syed's willingness to respond to Hogan's complaints.

Likewise, when Hogan met again with Dr. Syed on February 1, after his appointment with Dr. Hoechst, Syed agreed to refer Hogan to Dr. O'Brien, since at that point it was clear he was unwilling to participate in physical therapy and his knee pain was continuing.  While Hogan suggests that Dr. Syed should have simply ordered an MRI himself, it was not deliberate indifference for him to seek the opinion of a specialist.  To the contrary, given that Dr. O'Brien is an orthopedist, it was reasonable for Dr. Syed to defer to her specialized knowledge with respect to the next appropriate step to address Hogan's knee pain.

Finally, although Dr. Syed met with Hogan twice more in March of 2015, neither of those interactions support a finding of deliberate indifference.  In particular, on March 9, Dr. Syed explained that he did not believe it necessary to order an MRI when he had an upcoming appointment with Dr. O'Brien, especially given that Hogan's knee was not swelled, he was walking fine, and his range of motion was fine.  Even so, Dr. Syed offered him a cortisone injection in the meantime.  Then, on March 30, Dr. Syed states that Hogan became argumentative, again insisting on an MRI.  Although Hogan claims that he was trying to tell Dr. Syed about his level of pain, it is undisputed that Hogan refused a further cortisone injection, and that Dr. Syed ended the examination out of concern that that their interaction was becoming hostile.  Again, Hogan would argue that Dr. Syed could have ordered the MRI by that point, but there is no evidentiary basis to find an urgent need for the MRI, especially without yet having Dr. O'Brien's more expert input.

19

In the end, Hogan himself appears to have been the *only* person who believes he needed an MRI earlier.  While a patient's own subjective objections to his care or desire for different, even better, care are important factors for a trier of fact to consider, they are not enough to support a reasonable finding that Dr. Syed acted with deliberate indifference to Hogan's knee injury or reported pain.  *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (while a prisoner is entitled to reasonable measure to prevent a risk of harm, he "is not entitled to the best care possible"); *Pyles,* 771 F.3d at 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.") (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

As for proof of injury from Dr. Syed's claimed delay, there is also no evidence suggesting that if Dr. Syed recommended the MRI earlier than May 19, 2016, Hogan would have undergone surgery sooner.  For one, Dr. Syed could not control the fact that the DOC's Medical Director cancelled his order for an MRI, even though supported by Drs. Hoechst and O'Brien.[8]  Nor is there any evidence of record suggesting that Dr. Syed was responsible in any way for the Medical Director's denial of his May 19, 2016, order

---

[8] Even if an MRI had been ordered sooner, Drs. Syed and O'Brien also opined that the proper course of treatment would still have been to begin with conservative treatment, including a course of physical therapy that would have largely parroted the treatment Hogan actually received between September 2015 and May 2016.  Since this includes the entire period that Dr. Syed was seeing Hogan for his knee pain, the evidence of record does not suggest that any arguable delay on Syed's part in ordering an MRI unnecessarily prolonged Hogan's pain.  *Cf. Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010) (delay in sending prisoner to dentist for tooth delay resulted in an additional two-month period of escalating pain); *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (prisoner "bled, vomited, sustained retinal or corneal damages, and endured dizziness and severe pain for five days as guards merely looked on"); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (prison doctor's delay because of holiday plans caused permanent disfigurement).

for an MRI; or for the fact that Hogan did not actually undergo surgery until May of 2017, over six months after his MRI.  Indeed, even after the MRI confirmed a meniscal tear, Dr. Grossman did not unequivocally recommend surgery.  Rather, he explained to Hogan that surgery was elective and may not actually alleviate his pain, since his symptoms and history of heavy lifting suggested that his knee condition was degenerative, not a result of the tear.

For all these reasons, Dr. Syed is entitled to summary judgment in his favor with respect to Hogan's deliberate indifference claim against him.

### B.    Dr. Hoechst

Dr. Hoechst's handling of Hogan's knee injury likewise does not rise to a constitutional violation.  While Hogan claims that Dr. Hoechst should not have ordered PT for his soft tissue injury, he cites no evidence to support that claim, or even that PT would be an inappropriate course of treatment, as opposed to simply a conservative one. If anything, the record establishes that during the periods of time when Hogan was participating in PT, Dr. Hoechst's handling of his care was reasonable, and Hogan has identified no instance where Hoechst failed to take reasonable steps to respond to Hogan's need for treatment for his knee injury.

In fact, in January of 2015, Hogan first met with Dr. Hoechst, just a month after he reported his knee injury to Dr. Hoffman and within two weeks of Dr. O'Brien's referral for PT.  Dr. Hoechst immediately provided Hogan with workouts and exercises, ordered six weeks of PT and provided Hogan a steroid-infused cream/gel.  Dr. Hoechst further attempted to work with Hogan the following month, but Hogan reported that he was still

21

engaging in physical activity on February 9; and on February 18, Hogan actually told Hoechst that he would "work it out himself." This evidence suggests only that Dr. Hoechst was attempting to help Hogan strengthen his muscles and ligaments around his knee and in his legs to support the knee joint, as well as work with Hogan to understand how his activity level might hinder his knee's improvement. *Nothing* in this record indicates that Dr. Hoechst failed to exercise reasonable medical judgment in these three interactions.

Similarly, after Dr. Syed referred Hogan back to PT over six months later, Dr. Hoechst simply recommended on September 29, 2015, that Hogan stop his lower extremity exercise and impact activities, which Hogan had reported was causing him pain. Beyond noting his long-term pain and Dr. Hoechst not requesting an MRI, Hogan has submitted no evidence indicating that Hoechst's recommendation ran afoul of an acceptable standard of care. To the contrary, Drs. O'Brien and Syed agree that PT is routinely prescribed for knee injuries, even when a meniscus tear is suspected. In particular, Dr. O'Brien explained that the general consensus among medical providers is: patients will benefit from strengthening the ligaments and muscles around the knee; and a demonstrated commitment to compliance with PT is necessary to ensure a successful surgery, if ultimately warranted. Hogan might disagree with this approach to his care, but he has not submitted medical evidence calling into question the validity of these opinions. *See Shields v. Ill. Dep't of Corr.,* 746 F.3d 782, 797 (7th Cir. 2014) (approving recommendation of physical therapy from one specialist, rather than surgery from all other specialists, does not constitute deliberate indifference "where both recommendations are made by qualified medical professionals").

22

The same is true of Hogan's interactions with Dr. Hoechst in early 2016. Again, Hogan reported to Dr. Hoechst that he was still engaging in impact exercises, then tersely asked how long he would have to do PT before Hoechst would order an MRI. At that point, Dr. Hoechst not only agreed to refer him to Dr. O'Brien to consider an MRI, he also ordered Hogan a knee sleeve and prescribed him iontophoresis and dexamethasone treatment for his left knee. On this record, therefore, it would be unreasonable to infer that Dr. Hoechst's decision to refrain from immediately ordering an MRI for Hogan, and instead to urge Hogan's effective participation in PT, providing treatment and support in the meantime, exhibited a failure to exercise medical judgment.

### C.    Nurses Warner, Gohde, Anderson and Thorne

Finally, defendants seek summary judgment in their favor on Hogan's claims against Nurses Warner, Gohde, Anderson and Thorne, since none of them ignored the complaints Hogan repeatedly raised in some 17 HSRs submitted between January and March of 2016.

During this time frame, Hogan's complaints consistently related to the same knee injury and his desire for an MRI. To begin, the undisputed record shows that the nursing staff neither had the authority to order an MRI nor to refer Hogan to an offsite specialist. Furthermore, there is no question that Drs. Hoechst and Syed knew that Hogan wanted an MRI, and neither of them found an immediate need. By February 1, 2016, Dr. Hoechst had noted Hogan's request for an MRI, and referred that request to Dr. Syed. Then, on March 9 and March 30, Hogan met with Dr. Syed, repeating his request for an MRI.

Given that Hogan's reported symptoms during this four-month period remained the same, there would have been *no* reason for the nursing staff to second-guess the treatment prescribed by the doctors, or to do anything more than relay Hogan's requests, provide him with the prescribed medications, and ensure that he was seen as scheduled. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on a doctor's instruction unless it's obvious that the doctor's advice will harm the prisoner); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (a nurse's "deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient"). Moreover, Hogan has pointed to no other evidence permitting an inference that Nurses Warner, Gohde, Anderson or Thorne undertook any steps to delay his MRI until October 31, 2016. As such, no reasonable fact finder could find that these defendants responded with deliberate indifference to Hogan's repeated requests for an MRI.

More broadly, there is no evidence that HSU staff *ignored* Hogan's complaints of pain during this time frame. Again, to the contrary, HSU staff responded to his ongoing concerns by either noting that he was scheduled to be seen or referring him to a physician and receiving various interventions to alleviate his pain, including over-the-counter medications, a knee brace and ice. Despite Hogan's disagreement with his treating physicians as to his need for an MRI much earlier, the nurse defendants' ongoing treatment of Hogan's knee and related pain precludes any inference that they consciously disregarded his reports of pain. *Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013) (while plaintiff was dissatisfied with his medical care, deliberate indifference claims were properly dismissed

because the record established that he had "received medical attention, medication, testing and ongoing observation"). Accordingly, nurses Warner, Gohde, Anderson and Thorne are also entitled to summary judgment in their favor on Hogan's deliberate indifference claims as well.

## II.    State Law Claims

In their initial briefing, defendants sought judgment in their favor with respect to Hogan's medical malpractice/negligence claims as well, arguing that Hogan's notice of claim should limit the negligence claims he may pursue in this case.[9] However, the general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial. 28 U.S.C. § 1367(c); *Burritt v. Diflefsen*, 807 F.3d 239, 252 (7th Cir. 2015).

Here, the court is entering an adverse judgment as to all of Hogan's federal claims against defendants. Under such circumstances, the court will typically decline to exercise supplemental jurisdiction over any remaining state law claims. Subject to the applicable Wisconsin statute of limitations, Hogan may pursue his negligence claims in state court.[10]

---

[9] Hogan served one notice of claim concerning his claims in this case, NOC-2016-10838. Hogan's notice of claim was received by the Wisconsin Department of Justice via Certified Mail, postmarked November 18, 2016.

[10] Assuming Hogan does not appeal this decision, the statute of limitations will begin running again on the date judgment is entered dismissing these claims. As such, Hogan should promptly pursue a state law claim if he intends to do so.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #23) is GRANTED with respect to plaintiff Philip Hogan's Eighth Amendment deliberate indifference claims against defendants.

2. The court declines to exercise supplemental jurisdiction over Hogan's state law claims against defendants, which are DISMISSED without prejudice.

3. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 1st day of October, 2020.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge